UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DANIEL B. ABRAHAMS,

    *Plaintiff*,

v.

SIMPLIFY COMPLIANCE, LLC d/b/a/
BLR-BUSINESS & LEGAL RESOURCES,

    *Defendant.*

Civil Action No. 19-3009 (RDM)

**MEMORANDUM OPINION AND ORDER**

From 1985 to 2003, Plaintiff Daniel Abrahams contracted with the Thompson Publishing Group ("TPG") to author a series of publications related to the Fair Labor Standards Act. TPG eventually sold the publication rights to Abrahams's works to Columbia Books in 2013, which, in turn, sold the rights to Defendant Simplify Compliance ("Simplify") in 2016. Simplify then purportedly terminated Abrahams's publication agreement, refused to pay him any fees or royalties, and continued to market, sell, and distribute his publications.

In 2019, Abrahams filed suit against Simplify, asserting D.C.-law tort and contract claims and one federal claim under the Lanham Act, 15 U.S.C. § 1125. Simplify removed the action to this Court, Dkt. 1, and soon after filed a motion to dismiss the complaint, Dkt. 14. For the reasons that follow, the Court will **GRANT** in part and will **DENY** in part Simplify's motion.

**I. BACKGROUND**

As it must, the Court accepts Abrahams's factual allegations as true for purposes of deciding Simplify's motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A.   **Factual Background**

In 1985, Gilbert Ginsburg and Plaintiff Daniel Abrahams, then a third-year associate at the law firm Epstein Becker & Green, P.C., entered into a publication agreement with TPG to write a book entitled *Fair Labor Standards Act Handbook for States, Local Governments & Schools* ("FAIR"). Dkt. 1-1 at 6–7 (Compl. ¶ 6). Over the years that followed, Abrahams and TPG entered into several additional contracts that "pertained to TPG's publication of certain of [Abrahams's] writings on the Fair Labor Standards Act [] and other topics in employment law." *Id.* at 7 (Compl. ¶¶ 8–9).

The agreement that is central to Abrahams's claims was executed in 1993 and governed the publication of Abrahams's work *Employer's Guide to the Fair Labor Standards Act* ("WAGE"). *Id.* (Compl. ¶ 10). Under that agreement, Abrahams "was made responsible for writing" and was required to "serve as a contributing editor of" WAGE. *Id.* (Compl. ¶ 11). Abrahams also alleges that, "[p]ursuant to Article 5 of the WAGE [p]ublication [a]greement, the [duration] of the agreement was to last through the life of the WAGE publication absent termination by Plaintiff" and that "TPG only was allowed to terminate the agreement if Plaintiff breached the agreement." *Id.* at 8 (Compl. ¶ 12). Finally, the WAGE publication agreement "called for the payment of $30,000 for the initial writing of the publication;" "provided for the payment of . . . $1,500 per month" for Abrahams "to serve as a contributing editor of" the publication; and provided Abrahams a stream of royalty payments based on, *inter alia*, how many copies of the publication were sold. *Id.* (Compl. ¶¶ 13–14).

After the WAGE publication agreement was consummated, a number of other agreements followed:

- In December 1993, Abrahams and TPG entered into a contributing editor agreement for the FAIR publication, effective from October 1993 through September 1994. *Id.* at 9 (Compl. ¶ 17).

2

- In August 1994, Abrahams and TPG entered into an agreement for the publication of the *Public Employers Guide to the Fair Labor Standards Act* ("JOBS"). *Id.* at 8 (Compl. ¶ 15). The JOBS agreement further provided that Abrahams would serve as contributing editor of the publication for the period of one year. *Id.*

- In January 1995, Abrahams and TPG entered into a publication agreement for the *FLSA Employee Exemption Handbook* ("FILE"), as well as a contributing editor agreement for the period of April 1995 through March 1996. *Id.* at 8–9 (Compl. ¶ 16).

- In July 1996, Abrahams and TPG entered into contributing editor agreements with respect to the FAIR, WAGE, JOBS, and FILE publications from July 1, 1996 through July 1, 1997. *Id.* at 9 (Compl. ¶ 19).

- In 1999, Abrahams and TPG entered into contributing editor agreements with respect to the FAIR, WAGE, JOBS, and FILE publications for the period of December 1, 1999 through December 1, 2000. *Id.* (Compl. ¶ 20).

- In January 2003, Abrahams and TPG entered into contributing editor agreements with respect to the FAIR, WAGE, JOBS, and FILE publications for the period of January 20, 2003 until terminated by either party. *Id.* (Compl. ¶ 21).

- Finally, Abrahams and TPG "also entered into agreements for other publications including the submission of materials for an on-line forms publication." *Id.* at 10 (Compl. ¶ 24).

In April 2004, roughly a year after the last of Abrahams's agreements with TPG was executed, TPG sold its rights under the WAGE, FAIR, FILE, and JOBS publication agreements to Thompson Information Services ("TIS"). *Id.* (Compl. ¶ 25). TIS subsequently sold its interests under the agreements to Thompson Media Group, LLC, *id.*, which, in turn, sold its interests to Columbia Books in 2013, *id.* (Compl. ¶ 27). Three years later, in 2016, Columbia Books notified Abrahams "that it intended to sell the publication rights" under the WAGE, FAIR, FILE, and JOBS publication agreements to Defendant Simplify. *Id.* at 11 (Compl. ¶ 31). Columbia Books further informed Abrahams "that Simplify would continue to use [Abrahams's]

3

services pursuant to the terms of the agreements." *Id.* (Compl. ¶ 32). Abrahams, "[r]elying upon these representations, . . . executed his consent to the assignment of the agreements to [Simplify] shortly" thereafter. *Id.*

"For the next few months," Simplify "honored and performed its duties under the agreements including its duty to pay [Abrahams] for his ongoing editorial services." *Id.* (Compl. ¶ 33). In September 2016, however, Simplify changed course, informing Abrahams that it intended "to unilaterally terminate [his] editorial services," a decision that, Simplify explained, it was making "strictly for financial reasons," which had "no bearing on the quality of [Abrahams's] work, or on [Simplify's] appreciation of it." *Id.* at 11–12 (Compl. ¶ 34) (quotation marks omitted). Simplify then "suspended payment of all fees for services, royalties, book sales, and any other payments to [Abrahams]" and "failed to pay [Abrahams] the final invoiced bill." *Id.* at 12 (Compl. ¶ 35).

Nevertheless, Simplify "continues to market, sell and distribute [Abrahams's] publications" and "continues to publish [certain] updates and newsletters that were the subject of the agreements." *Id.* (Compl. ¶ 38). It does so, moreover, by "hold[ing] [Abrahams] out to the public as editor of the publications via its website, among other media, on a global basis." *Id.*; *see also id.* at 18 (Compl. ¶¶ 74–75) (Simplify "lists [Abrahams] as the premier editor of the [] publications . . . [and] claims [that Abrahams] serves on the [e]ditorial [a]dvisory [b]oard for these products."). After consolidating the JOBS and FILE publications, *id.* at 12 (Compl. ¶ 39), Simplify "has apparently licensed the rights to FAIR, WAGE[,] and JOBS to Westlaw," meaning that Abrahams's "publications are now available in the general library of Westlaw," *id.* at 13 (Compl. ¶ 40); *see also id.* at 16 (Compl. ¶ 63) (alleging that Simplify has granted "the rights to access WAGE to tens of thousands of subscribers annually through their Westlaw

4

subscriptions"). In addition, Simplify "offer[s] the publications" for sale on its website. *Id.* at 19 (Compl. ¶ 82); *see also id.* at 18 (Compl. ¶ 71). Since October 2016, however, Simplify has not paid Abrahams anything. *Id.* at 14, 17, 18, 24 (Compl. ¶¶ 46–48, 66–68, 76, 78, Prayer for Relief).

**B.      Procedural Background**

Abrahams filed this suit on September 5, 2019 in the Superior Court of the District of Columbia, Civil Division. *See Abrahams* v. *Simplify Compliance, LLC*, Civil Action No. 2019 CA 005835 B. He alleges six claims under D.C. law: breach of contract (Count 1); fraudulent or negligent misrepresentation/inducement (Count 2); accounting (Count 3); misappropriation of name and likeness (Count 5); unjust enrichment (Count 6); and promissory estoppel (Count 7). *See generally* Dkt. 1-1 at 13–17, 21–24 (Compl. ¶¶ 41–69, 90–107). In addition, Abrahams asserts one federal claim, alleging that Simplify's "unauthorized use of [his] name, likeness and representation," *id.* at 18 (Compl. ¶ 77) (Count 4), constitutes "false association" or "false endorsement" in violation of the Lanham Act, Dkt. 16 at 29.

On October 7, 2019, Simplify removed Abrahams's suit to this Court on the basis of federal-question jurisdiction. Dkt. 1 (Notice of Removal); *see also* Dkt. 3-2 at 2–3. Simplify then filed a motion to dismiss, arguing that Abrahams's complaint failed to state a claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. 14. Abrahams filed his opposition to Simplify's motion, Dkt. 16, and Simplify filed its reply, Dkt. 17.

## II.  LEGAL STANDARD

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of the allegations contained in the complaint. A complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl.*

5

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also* Fed. R. Civ. P. 8(a).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* (citations omitted).  If the complaint's allegations fail to meet this standard, the court must dismiss the action.  *Id.*

### III.  ANALYSIS

The Court will begin its analysis with Abrahams's Lanham Act claim, but for which the Court would lack federal-question jurisdiction.  As relevant here, Section 43(a) of the Act provides as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  "Section 43(a) thereby provides for 'two distinct bases of liability'— first, in subsection (A), false association, also known as unfair competition or trademark

6

infringement and, second, in subsection (B), false advertising." *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 743 F. App'x 457, 463 (D.C. Cir. 2018) (hereinafter "*PLM*") (quoting *Lexmark Int'l, Inc. v. Static Control Components*, 572 U.S. 118, 134 (2014)).

To proceed with a false advertising claim, a plaintiff must satisfy two threshold requirements. First, the plaintiff must "come within the zone of interests in a suit for false advertising," requiring that the plaintiff "allege an injury to a commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 131–32. Second, the plaintiff's injuries must be "proximately caused by violations of the statute," which "occurs when [the defendant's] deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 132–33. Taken together, then, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.*

Here, Abrahams raises a false association, not false advertising, claim. Dkt. 16 at 29. And so, the question arises whether *Lexmark*'s zone-of-interests and proximate cause requirements for false advertising claims also apply to false association claims. The D.C. Circuit has held that they do. In 2018, the court of appeals considered a dispute between two vendors of paletas—a frozen, fruit-based Mexican-style dessert akin to popsicles—that had "assert[ed] conflicting trademark and false-advertising claims over words and images they use in their competing paleta sales in the United States." *PLM*, 743 F. App'x at 458. The *PLM* court explained, albeit without employing the specific terminology of the zone of interests or proximate cause, that "[t]o make out a false association claim" based on the misuse of a trademark, a plaintiff "must establish a few key elements: (1) [the defendant] uses the mark in U.S. commerce in connection with the sale of goods or services; (2) [the defendant's] use of its

mark is likely to cause consumer confusion; and (3) [the defendant's] use will likely damage [the plaintiff]." *Id.* at 463 (citing 15 U.S.C. § 1125(a)(1)(A); J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 27:13 (5th ed. 2018) (hereinafter "*McCarthy on Trademarks*")). A plaintiff, *PLM* continued, "can only establish the third element, damage, upon making a prerequisite showing that it has a legally cognizable commercial interest that would be harmed by infringement." 743 F. App'x at 463 (citing *Lexmark*, 572 U.S. at 128–32). To make that showing, in turn, a plaintiff must demonstrate "an injury to its commercial sales or prospects," such as "loss of sales from customers" or "evidence of consumer confusion," *id.* at 468—in short, just what *Lexmark* requires, *see* 572 U.S. at 128–32. Thus, whether viewed as elements of the claim (*PLM*, 743 F. App'x at 463) or threshold limitations on "the class of plaintiffs whom Congress has authorized to sue" (*Lexmark*, 572 U.S. at 128), the basic point is the same: a plaintiff may not prevail on a false association claim without alleging a commercial injury.[1]

Abrahams has failed to do just that. His complaint offers no factual allegations averring that he is suffering or will be likely to suffer the type of commercial harm that the Lanham Act seeks to prevent. He relies, instead, on "mere conclusory statements," or "[t]hreadbare recitals of the elements" of injury, which, the Supreme Court has instructed, are categorically insufficient "to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting

---

[1] Although *PLM* was a trademark action and did not involve, as here, a false association claim based on the misattribution of a person's endorsement of a particular product, "[c]ourts treat a claim of false endorsement as asserting a type of infringement of an unregistered trademark"—[t]hat is, courts say that, in the context of § 43(a)(1)(A) . . . a human persona or identity is a kind of 'trademark' which is infringed by a false endorsement." J. Thomas McCarthy *et al.*, *The Rights of Publicity and Privacy* § 11:35 (2d ed. 2020); *see also id.* § 5:31 n.8 (collecting cases); *McCarthy on Trademarks* § 28:15 (cited favorably in *PLM* and reiterating that "a human persona or identity is a kind of 'trademark' which is infringed by a false endorsement").

*Twombly*, 550 U.S. at 570). Abrahams alleges, for example, that Simplify "has deprived [him] of the fundamental value of his name and abilities with regard to editing the publication," Dkt. 1-1 at 18 (Compl. ¶ 79), and claims that because Simplify "holds [him] out [] as an editor without permitting him to control the quality of the work," it has "depriv[ed] him of the ability to maintain his reputation and standing in the marketplace," *id.* at 19 (Compl. ¶ 83). Missing from these allegations, however, is any explanation of how Simplify's conduct harms Abrahams's cognizable commercial interests. Abrahams does not claim that the publications are of substandard quality or that he disagrees with or disapproves of their contents, such that his association with the publications risks his reputation (indeed, Abrahams authored or edited the publications himself). Nor does Abrahams allege that he has found it more difficult to market his own products, labor, or identity as a result of Simplify's purportedly false association, or that any individual has declined, or is likely to decline, to do business with him as a result of Simplify's actions. A similar flaw attends Abrahams's claim that Simplify "is likely to confuse purchasers to believe, contrary to fact, that the publications are authorized, endorsed, or sponsored by [Abrahams]." *Id.* at 20 (Compl. ¶ 86). What commercial injury does this alleged confusion produce? Abrahams's complaint does not say.

    This does not mean, of course, that Abrahams has suffered no injury at all. He alleges, for instance, that "the publications are being marketed in a manner that trades on [his] reputation and good will without compensating him." *Id.* (Compl. ¶ 88). And a loss of compensation is surely a cognizable injury under Article III. *See Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 704 (D.C. Cir. 1988). But that harm is not the sort of commercial injury that the Lanham Act was designed to remediate. As the Supreme Court explained in *Lexmark*:

> The [Lanham Act] authorizes suit by any person who believes that he or she is likely to be damaged by a defendant's false advertising. Read literally, that

9

> broad language might suggest that an action is available to anyone who can satisfy the minimum requirements of Article III. . . . [T]he unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades us that [§ 1125(a)] should not get such an expansive reading.

572 U.S. at 129 (quotation marks and citation omitted, third alteration in the original); *see also PLM*, 743 F. App'x at 468 (cognizable injuries under the Lanham Act include "an injury to [] commercial sales or prospects," such as "loss of sales from customers"). Based on Abrahams's pleadings as they now stand, then, the Court cannot permit his Lanham Act claim to go forward. Abrahams has not alleged facts sufficient to support a plausible inference or conclusion that he has suffered, or is likely to suffer, a commercial injury as a result of Simplify's actions.

Against the foregoing, Abrahams raises just one argument: he contends that "[t]he law is crystal clear that a plaintiff . . . is entitled to pursue a claim on a false endorsement theory if he or she has 'an existing intent to commercialize an interest in identity.'" Dkt. 16 at 29 (quoting *Edmondson v. 2001 Live., Inc.*, 2019 WL 670201 *7 (M.D. Fla. Jan.15, 2019)). This argument stumbles before it starts. In *PLM*, the plaintiff not only intended to commercialize, but was in fact commercializing the disputed mark at issue, 743 F. App'x at 460–61, yet the D.C. Circuit still required the plaintiff to show "damage [to] . . . a legally cognizable commercial interest," *id.* at 463. As the *PLM* court explained, the plaintiff's Lanham Act claim failed because the plaintiff "ha[d] not established an injury to its commercial sales or prospects." *Id.* at 468. Here, Abrahams faces the same essential difficulty; he has not alleged an injury to a commercial interest resulting from Simplify's actions.

Moreover, even if alleging an existing intent to commercialize an interest in identity was sufficient to state a claim of injury under the Lanham Act, Abrahams's complaint would still fail because it contains no allegation that Abrahams intends to commercialize his identity in any way. To be sure, Abrahams's motion papers argue that he "not only intended to trade on his

10

identity, he presently is publicly marketing his identity" because "his law firm bears his name, and his website too." Dkt. 16 at 30. But these statements appear nowhere in the complaint, nor are they attached to, incorporated by reference in, or integral to the complaint. The Court thus cannot consider them. *See Int'l Brotherhood of Teamsters v. Atlas Air, Inc.*, 435 F. Supp. 3d 128, 135 (D.D.C. 2020). Absent any concrete allegations, moreover, the Court expresses no view as to what might (or might not) suffice.

In sum, because the complaint contains no factual allegations that Abrahams is, or is likely to, suffer a commercial injury cognizable under the Lanham Act, the Court cannot conclude that Abrahams's Lanham Act claim is sufficiently pled. The Court will, accordingly, dismiss Abrahams's Lanham Act claim, but will permit Abrahams to file an amended complaint as to that claim if he has a good-faith basis for doing so.

**B.     Jurisdiction**

When this case was removed, the Court had supplemental jurisdiction over Abrahams's D.C.-law claims because they derived from the same "nucleus of operative fact" as his federal claim. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *see also* 28 U.S.C. § 1367(a). But now that the Court is dismissing Abrahams's federal claim, "it has the discretion to exercise—or decline to exercise—supplemental jurisdiction over any state-law claims that remain." *United Mine Workers*, 383 U.S. at 726; *see also Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1097 (D.C. Cir. 2011) ("Whether to retain jurisdiction over pendent . . . claims after the dismissal of the federal claims is a matter left to the sound discretion of the district court[.]" (quotation marks and citation omitted)). Guiding that discretion are "[g]eneral equitable factors . . . including judicial economy, convenience, fairness, and comity." *Pollard v. District of Columbia*, 191 F. Supp. 3d 58, 82 (D.D.C. 2016) (quotation marks and citation omitted)); *see also Deppner v. Spectrum Health Care Res., Inc.*, 325 F. Supp. 3d 176, 190–91 (D.D.C. 2018).

In the mine run of cases, however, "the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1267 (D.C. Cir. 1995).

The parties have not addressed whether, in the absence of a federal claim, the Court should exercise supplemental jurisdiction over the remaining claims in this case. At least two questions, moreover, precede that one. First, the Court does not foreclose the possibility that Abrahams might be able to amend his complaint to cure the defects in his Lanham Act claim. Second, even if federal-question jurisdiction is ultimately lacking, diversity jurisdiction might exist. At the time of the complaint's filing, Abrahams was a resident of Maryland while Simplify was organized under the laws of Delaware as a limited liability company with its principal place of business in Tennessee. Dkt. 1-1 at 5–6 (Compl. ¶¶ 2–3). The notice of removal, however, lists only federal-question jurisdiction, not diversity jurisdiction, as the basis for removal. Dkt. 1 at 1, 3; *see also* Dkt. 3-2 at 2–3 (civil cover sheet reiterating that Simplify's removal was predicated on federal-question, not diversity jurisdiction). That may be for good reason: "[u]nincorporated associations, including LLCs" like Simplify, "have the citizenship of *each* of their members," *CostCommand, LLC v. WH Adm'rs, Inc.*, 820 F.3d 19, 21 (D.C. Cir. 2016) (emphasis added) (citing *Americold Realty Trust v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1015 (2016)), and it is at least possible that Simplify declined to remove on the basis of diversity jurisdiction because one or more of its members is non-diverse. But regardless of what Simplify might (or might not) have concluded before removing this action, the Court does not know the citizenship of Simplify's members and, thus, cannot determine whether complete diversity exists.

12

The Court will, accordingly, provide Abrahams the opportunity to file an amended complaint if he has a good-faith basis for doing so, and will then require each party to file a status report addressing the Court's jurisdiction. Until then, it is premature for the Court to decide whether this action should be remanded to the Superior Court and premature for the Court to address the legal sufficiency of Abrahams's D.C.-law claims.

## CONCLUSION

For the reasons explained above, it is hereby **ORDERED** that Simplify's Motion to Dismiss, Dkt. 14, is **GRANTED** in part and **DENIED** in part; it is further

**ORDERED** that Simplify's Motion to Dismiss is **GRANTED** with respect to Abrahams's Lanham Act claim (Count 4); it is further

**ORDERED** that Abrahams's Lanham Act claim (Count 4) is **DISMISSED** without prejudice; it is further

**ORDERED** that Simplify's Motion to Dismiss is **DENIED** as premature with respect to the remaining Counts in the complaint; it is further

**ORDERED** that Abrahams may file an amended complaint on or before April 16, 2021, addressing the deficiencies explained above, if a good-faith basis exists for doing so; it is further

**ORDERED** that each party shall file a status report on or before April 30, 2021, addressing the Court's subject-matter jurisdiction; and it is further

**ORDERED** that the parties shall appear by telephone for a status conference in this matter on May 7, 2021 at 11:00 a.m.

                                                /s/ Randolph D. Moss
                                                RANDOLPH D. MOSS
                                                United States District Judge

Date: March 30, 2021